IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
CLARKSBURG

UNITED STATES OF AMERICA,

        Plaintiff,

v.                                            Criminal Case No.: 1:22-CR-62
                                                   (JUDGE KLEEH)

BROCK COREL PEARSON,

        Defendant.

**REPORT AND RECOMMENDATION RECOMMENDING THAT
DEFENDANT'S MOTION TO SUPPRESS [ECF NO. 18] BE DENIED**

Presently pending before the undersigned Magistrate Judge is Defendant Brock Corel Pearson's ("Defendant") Motion to Suppress Physical Evidence [ECF No. 18], filed on November 1, 2023. By Referral Order dated November 1, 2023 [ECF No. 19], the Hon. Thomas S. Kleeh, Chief United States District Judge, referred the motion to the undersigned for conducting a hearing and entering a Report and Recommendation as to disposition of the motion.

The undersigned also is in receipt of the Government's response in opposition to Defendant's motion, filed on November 9, 2023. [ECF No. 22]. The undersigned conducted a hearing on Defendant's motion on November 14, 2023, at which the Court heard witness testimony and received evidence.

Based on a detailed review of Defendant's motion [ECF No. 18], the Government's response [ECF No. 22], the witness testimony and evidence introduced during the hearing, and the entirety of the record and pertinent legal authority, the undersigned respectfully **RECOMMENDS** that Defendant's motion be **DENIED** as set forth herein.

**I. FACTUAL AND PROCEDURAL BACKGROUND**

Defendant is named in a single-defendant Indictment which a Grand Jury returned on September 7, 2022. Defendant is named in the Indictment with the sole offense of Unlawful

1

Possession of a Firearm, in violation of Title 18, United States Code, Sections 922(g)(1) and 924(a)(1), as a previously-convicted felon prohibited from possessing a firearm.

Defendant was the passenger in a vehicle that was subject to a traffic stop in the nighttime hours of March 1, 2022. The officer who initiated the stop did so for two traffic violations: (1) the vehicle's loud exhaust system and (2) speeding. Upon speaking with the occupants of the vehicle, the officer learned that the driver had an expired operator's license. Defendant himself volunteered his identification to the officer, and when the officer ran Defendant's name through dispatch, he learned that Defendant was the subject of an outstanding arrest warrant. Defendant was arrested on the outstanding warrant. In the course of a pat-down incident to arrest, the officer discovered a firearm on Defendant's person. Defendant acknowledged to the officer that he had a past felony conviction. The Indictment herein resulted.

## II. SUMMARY OF TESTIMONY AND EVIDENCE

During the aforementioned suppression hearing on November 14, 2023, the Court heard sworn testimony from two witnesses, namely, (1) Justin Hetherington ("Hetherington"), who was working as a police officer with the Shinnston Police Department, in Harrison County, in the Northern District of West Virginia, at the time of events giving rise to the Indictment herein, and (2) Zachary Ables ("Ables"), who was driving the vehicle which was the subject of the traffic stop at issue (and in which Defendant was a passenger). During the hearing, the Government introduced evidence in the form of Hetherington's body camera footage taken during the traffic stop, marked as Government's Exhibit 1.

## A. Hetherington's Testimony

The Government called Hetherington to testify. According to Hetherington's testimony at the suppression hearing,[1] he has been a police officer since 2016 and has worked for several police departments in the area. [9:04:50 to 9:05:15]. At the time of the events in question, on March 1, 2022, he was working as a police officer with the Shinnston Police Department. [9:05:18 to 9:05:33]. Hetherington made contact with Defendant when he initiated a traffic stop of a vehicle on Pike Street in Shinnston. [9:05:36 to 9:05:54]. Defendant was a passenger in the vehicle. Id.

In initiating the stop, Hetherington had observed the vehicle traveling at rate of speed faster than the 25 MPH speed limit. [9:05:55 to 9:06:22]. Hetherington utilized the "pacing" method to determine that the vehicle was speeding. Id. Hetherington testified that as he traveled behind the vehicle, he was driving at a consistent rate of speed of 35 MPH. Id. He explained that the vehicle ahead of him was traveling at such a speed that the distance between Hetherington and the vehicle was increasing. Id. Thus, Hetherington surmised that the vehicle he was observing was traveling faster than 35 MPH. Id.

Hetherington testified that another reason he decided to stop the vehicle was for the vehicle's loud exhaust. [9:06:23 to 9:06:26].

Hetherington then testified as to certain portions of his body camera footage captured during the traffic stop.[2] The footage begins at the time Hetherington pulled over the vehicle. [9:06:33 to 9:11:04]. In the first portion of the footage highlighted by the Government during

---

[1] The citations here to times in brackets correspond to the times of the Court's archived audio recording of the suppression hearing on November 14, 2023, which is located on the section of the Court's intranet site for FTR recordings.

[2] The body camera footage was admitted into evidence as Government's Exhibit 1. The body camera footage has no time player to display the time lapsed during playback. Thus, this Report and Recommendation does not note specific times in the video playback for portions of the body camera footage shown during the hearing.

Hetherington's testimony, Hetherington tells the vehicle occupants that he has made the stop for speeding and for the vehicle's loud exhaust. Id. The driver of the vehicle (later identified as Ables) states that his driver's license has been suspended. Id. Defendant, in the passenger seat, states that he has a valid driver's license and offers to show it to Hetherington, which Hetherington accepts. Id. Ables states that his girlfriend has been aiming to have the vehicle repaired. Id. Hetherington then remarks to the two occupants of the vehicle that they are nervously shaking; that the driver has been stuttering; that the driver's eyes are abnormal from consumption or exposure to something; that he smells marijuana coming from the vehicle; and that the driver has the high beams of the headlamps on while driving in a populated area. Id.

As for the loud exhaust, Hetherington explained how, in the body camera footage, Ables acknowledged that there was a small hole in the exhaust and that it was going to be fixed. [9:12:40 to 9:12:49]. Hetherington further testified that he had dispatch run Defendant's driver's license. [9:13:00 to 9:13:23]. The information returned from dispatch indicated that Defendant was the subject of an outstanding arrest warrant (which the record otherwise shows to have been a domestic violence charge in Marion County, West Virginia). [9:13:35 to 9:14:14]. Hetherington then took Defendant into custody on the outstanding arrest warrant. Id.

The Government then showed a portion of the body camera footage of Hetherington patting down Defendant during the arrest. [9:15:09 to 9:19:20]. In the video footage, Hetherington asks Defendant if there is anything dangerous or illegal on his person. Id. Hetherington reaches into Defendant's pants, in the crotch area, and removes a pistol. Id. In this process, Defendant acknowledges that he is a felon. Id.

On cross-examination, Hetherington could not recall if he was stationary or in motion when he first observed the subject vehicle. [9:22:28 to 9:22:48]. Further, he stated that he estimated that

4

he paced the vehicle for a distance of three to four blocks before initiating the stop. [9:22:52 to 9:23:14]. Hetherington stated that the vehicle first drew his attention because of the noisy exhaust. [9:23:24 to 9:23:35]. He also explained that he prefers to have more reason than defective equipment to initiate a traffic stop, so he also paced the vehicle to determine that it was speeding. [9:23:36 to 9:23:56].

Defendant's counsel further inquired about the loud exhaust, to better understand what Hetherington observed about it. [9:23:58 to 9:25:11]. Hetherington explained that when patrolling on night shift, he usually has the windows of his patrol vehicle up and a podcast playing – and he still could hear the vehicle's exhaust, which he described as loud and unusual. Id.

Defendant's counsel also inquired about the vehicle's speed and Hetherington's use of the pacing technique. [9:26:23 to 9:28:02]. Hetherington stated that he paced the vehicle for approximately three to four blocks, and did not recall any other vehicle being between him and the vehicle he was pacing. Id. He also did not recall any vehicle in front of the subject vehicle. Id. He stated that there is a traffic light on the street on which he was pacing, but could not recall whether the subject vehicle had stopped at that traffic light. Id. He said that there are no stop signs on that street. Id. He could not give an estimated amount of time that lapsed from the time he first got behind the subject vehicle to the time that he initiated the stop. Id.

Further, on cross-examination, Hetherington acknowledged that, during the stop, he told the occupants of the vehicle that they were traveling a lesser amount over the speed limit (7 MPH) than they actually had been. [9:28:06 to 9:29:31]. He said that he gave them an inaccurate figure to see how they would respond to it. Id. Hetherington said that he would have recorded the accurate figure in the written incident report.[3] Id.

---

[3] A written incident report was not introduced as evidence during the suppression hearing.

Hetherington testified that he was classroom trained on the pacing method but not field trained on it. [9:30:00 to 9:31:15]. He testified that he received on-the-job training in detecting loud exhaust; as such, he was not trained or tested on how to detect a particular decibel level of a sound. [9:31:20 to 9:32:14].

On re-direct examination, Hetherington stated that no other vehicles on the evening of the traffic stop had drawn his attention the way that the subject vehicle had. [9:38:09 to 9:38:31]. He explained that pacing another vehicle involves a commonsense determination: if a vehicle ahead of him is accelerating away from his own vehicle, then that other vehicle is traveling faster than he is. [9:38:32 to 9:39:18]. And he reiterated that when he decided to initiate a stop of the subject vehicle, it was accelerating faster than his own vehicle, which he was operating at 35 MPH. [9:39:19 to 9:39:26].

### B. Ables's Testimony

Defendant called Ables to testify. Ables testified that he was driving the subject vehicle at the time of Hetherington's traffic stop. [9:42:39 to 9:44:00]. Ables testified that a couple of cars were in front of him in traffic as he came into Shinnston. [9:44:01 to 9:44:35]. He saw Hetherington's police vehicle parked alongside the road as he came into Shinnston. And Ables testified that he drove 50 to 100 yards, or one to two blocks, from the time Hetherington got behind him until the time he was pulled over. Id. Ables stated that he believed a vehicle other than Hetherington's was behind him while Hetherington followed, at least for a time. Id.

Ables testified that he was driving under the speed limit, because he saw traffic ahead which was stopped at a traffic light. [9:44:36 to 9:45:32]. He also stated that he was driving carefully because he had a suspended driver's license (the implication being that he did not wish to be caught driving without a valid license). Id.

6

Ables acknowledged that there was a small leak in the subject vehicle's exhaust system but that it was not remarkably loud. [9:45:56 to 9:47:29]. He said that the leak had been there for approximately a couple of weeks. Id. He recalled that he had operated the vehicle around town without incident related to the exhaust. Id. Ables testified that the exhaust was louder than that of a normal vehicle but not as loud as vehicles with a purposefully modified exhaust. Id.

Ables stated that he met Defendant through a mutual friend, and was friends with him a the time of the traffic stop, but had not remained friends with him. [9:48:15 to 9:49:00]. He had not wanted to appear for the suppression hearing, but did so pursuant to a subpoena. Id.

On cross-examination, the Government focused on Ables's drug use on the date of the traffic stop. [9:55:22 to 9:55:53]. During his testimony, he did not recall having told Hetherington that he had used drugs earlier that day of the traffic stop. Id. Yet, the Government asked Ables about admitting to consuming drugs earlier in the day, as depicted in the body camera video. Id. Ables eventually testified that he had been an active heroin user at that time. Id.

Ables also testified at the suppression hearing that he told Hetherington at the time of the stop that he had not been speeding. [9:50:30 to 9:50:50]. However, when shown the body camera video, Ables acknowledged that nowhere in the footage did he tell Hetherington that. [9:54:45 to 9:54:52].

### C. The Parties' Arguments

At bottom, Defendant argues that the traffic stop in question was improper. He challenges both reasons (loud exhaust and speeding) for the traffic stop. As such, Defendant argues, the firearm evidence seized during the traffic stop should be suppressed.

For its part, the Government argues that the traffic stop was lawful. The Government emphasizes that Hetherington's techniques were accurate and reliable. As such, per the

Government, the determination that Defendant was the subject of an active arrest warrant was lawful. Thus, the resulting arrest and pat-down incident thereto which yielded the firearm in question also were valid.

### III. LEGAL ISSUES AND ANALYSIS

The threshold issue here is whether Hetherington properly initiated the traffic stop for the stated reasons of the vehicle's loud exhaust and speeding. The undersigned **FINDS** that the stop was proper, for both reasons. As such, if the stop was lawful, then the undisputed facts otherwise show that the subsequent arrest and warrantless pat-down of Defendant (which yielded the firearm evidence in question) were lawful.

### A. Legal Principles

As a threshold matter, the undersigned notes the well-established principle that the Fourth Amendment of the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Moreover, for an arrest, "the general rule [is] that every arrest, and every seizure having the essential attributes of a formal arrest, is unreasonable unless it is supported by probable cause." Michigan v. Summers, 452 U.S. 692, 700 (1981).

Further, longstanding caselaw provides that "[s]topping an automobile and detaining its occupants constitute a 'seizure' within the meaning of the [Fourth and Fourteenth] Amendments . . ." Delaware v. Prouse, 440 U.S. 648, 653 (1979). A law enforcement officer is permitted to stop a vehicle when the officer observes a violation of a traffic law – even if the officer may be motivated to conduct the stop for a different reason. See United States v. Ortiz, 669 F.3d 439, 444 (4th Cir. 2012); Whren v. United States, 517 U.S. 806, 810 (1996); United States v. Palmer, 820 F.3d 640, 649 (4th Cir. 2016) (stating a traffic stop is reasonable at the outset "whenever it is lawful

for police to detain an automobile and its occupants pending inquiry into a vehicular violation. Without question, such a violation may include failure to comply with traffic laws.") (internal citation and quotation omitted).

In West Virginia, speeding is a traffic violation. W. Va. Code § 17C-6-1 (setting forth criminality of exceeding the speed limit on a public road and penalties for the same). In addition, in West Virginia, "Every motor vehicle shall at all times be equipped with a muffler in good working order and in constant operation to prevent excessive or unusual noise." W. Va. Code § 17C-15-34(a).

In any case, "it is a cardinal principle that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.'" Mincey v. Arizona, 437 U.S. 385, 390 (1978) (quoting Katz v. United States, 389 U.S. 347, 357 (1967)). It is the Government's burden to demonstrate that one of these exceptions applies. Coolidge v. New Hampshire, 403 U.S. 443, 455 (1971). Among those few exceptions to the requirement to obtain a warrant is the circumstance where the search of a person is incident to an arrest of that person. "[A] police officer who makes a lawful arrest may conduct a warrantless search of the arrestee's person and the area 'within his immediate control.'" Davis v. United States, 564 U.S. 229, 232 (2011) (citation and quotation omitted). The policy behind this exception is to remove any weapons an arrestee may possess and to secure evidence. United States v. Davis, 997 F.3d 191, 195 (4th Cir. 2021).

Finally, well-established is the exclusionary rule – that a court should exclude evidence obtained by dint of law enforcement's unlawful arrest or search. See Mapp v. Ohio, 367 U.S. 643 (1961). Relatedly, however, a court should suppress evidence in a criminal matter "only … where

9

its deterrence benefits of exclusion outweigh its substantial social costs." Hudson v. Michigan, 547 U.S. 586, 591 (2006) (citations and quotations omitted).

### B. Analysis

In the case at bar, Hetherington properly initiated the traffic stop of the subject vehicle in which Defendant was a passenger. Hetherington had probable cause that there were two traffic violations: (1) defective equipment in the form of a loud exhaust, and (2) speeding. Moreover, the resulting determination that Defendant was the subject of an outstanding arrest warrant was valid, as was the pat-down incident to his arrest pursuant to that warrant.

*1. Probable cause to stop for traffic violations*

The issue here is whether the loud exhaust and speeding gave rise to probable cause for a violation of traffic laws, such that Hetherington's stop of the subject vehicle was lawful.

"Probable cause is judged by an analysis of the totality of the circumstances . . . which are weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement. Under this pragmatic, common sense approach, we defer to the expertise and experience of law enforcement officers at the scene." U.S. v. Dickey-Bey, 393 F.3d 449, 453 (4th Cir. 2004) (citations and quotations omitted).

In the instant case, Hetherington credibly testified about how the loud exhaust of the vehicle in which Defendant was traveling caught his attention. Hetherington explained that the windows of his own vehicle likely were up, and that he likely had audio streaming inside the vehicle from a podcast. And despite those barriers to outside sound, the noisy exhaust caught his attention. Although Defendant's counsel probed Hetherington's ability to ascertain a noise's specific decibel level, West Virginia traffic laws do not require such specificity for a violation to exist. West Virginia Code, noted above, simply prohibits "excessive and unusual noise" from a

vehicle exhaust system. It is a subjective standard, and Hetherington convincingly explained how he perceived a violation of that standard.

Ables's testimony about how he did not perceive the noise to be much of an issue, and that it was not as loud as some other exhaust systems, is of no consequence. In the body camera footage, after Hetherington explained that the loud exhaust was a reason for the stop, Ables can be heard explaining that his girlfriend was to have been arranging certain repairs of the vehicle. Thus, in that moment, Ables tacitly acknowledged that the exhaust issue was significant enough that it needed attention. What is more, Hetherington convincingly explained at the suppression hearing how the noisy exhaust stood out in relation to that of other vehicles on the roadways that night. At bottom, the undersigned **FINDS** that Hetherington had probable cause to stop the subject vehicle because of its noisy exhaust.

As for the subject vehicle allegedly speeding, Hetherington also credibly testified about how he determined that it was speeding, using the pacing technique. Of note, in at least one prior matter, the undersigned reviewed the pacing technique and found that its use may be reliable, and those findings were later adopted. See United States v. Tyreese Marsh, No. 1:20-CR-38, at ECF No. 71 (N.D.W. Va. Oct. 29, 2020) (Aloi, J.), *report and recommendation adopted*, 1:20-CR-38, at ECF No. 103 (N.D.W. Va. Feb. 9, 2021) (Kleeh, J.)

Hetherington paced the subject vehicle for a long enough time and distance to measure the position of the subject vehicle in relation to his own. Plus, Hetherington was traveling at 35 MPH – 10 MPH over the posted speed limit. A "baseline" speed that is 10 MPH in excess of the posted speed limit (the posted limit being relatively lower, inside a town) is striking. And of course, with Hetherington's explanation that the subject vehicle actually was pulling away as he paced it, Hetherington's observation of speeding is all the more credible.

As with the noisy exhaust, Ables's testimony on the speeding issue is unconvincing. Ables stated during the suppression hearing that he was an active user of heroin at the time of events herein. As such, Ables's perception of speeding at the time, and his recollection of those events, are questionable.

Thus, the undersigned **FINDS** that Hetherington is credible in his testimony about pacing the subject vehicle, and that there was probable cause to initiate the traffic stop for speeding.

*2. Propriety of arresting Defendant and conducting pat-down incident to arrest*

Both the arrest of Defendant and corresponding pat-down incident to arrest, were lawful. As noted above, a search of a person is incident to an arrest of that person, without a warrant, is permissible. Davis v. United States, 564 U.S. at 232; United States v. Davis, 997 F.3d at 195.

In the instant matter, according to Hetherington's uncontested testimony, Defendant was the subject of an outstanding arrest warrant. As shown on the body camera footage, Defendant willingly offered his identification to Hetherington, and Hetherington dutifully ran Defendant's identification through dispatch. Upon learning of the outstanding arrest warrant, Hetherington had not just the *option*, but arguably had the *obligation*, to arrest Defendant during the traffic stop. The resulting pat-down, in the process of taking Defendant into custody, is so routine as to be unremarkable. The reason it is consequential in this matter, of course, is that it resulted in the discovery of the firearm that led to the Indictment herein.

Thus, the undersigned **FINDS**, then, that the arrest of Defendant on the outstanding warrant was lawful. Further, because the pat-down which yielded the firearm in question was incident to that arrest, the undersigned **FINDS** that the discovery of the firearm was lawful.

## IV. CONCLUSION

For the reasons set forth herein, the undersigned **RECOMMENDS** that Defendant's Motion to Suppress Physical Evidence [ECF No. 55] be **DENIED**.

Any party shall have fourteen (14) days (filing of objections) from the date of the filing of this Report and Recommendation to file with the Clerk of the Court **specific written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection.** A copy of such objections should also be submitted to the presiding United States District Judge. Objections shall not exceed ten (10) typewritten pages or twenty (20) handwritten pages, including exhibits, unless accompanied by a motion for leave to exceed the page limitations, consistent with LR PL P 12.

**Failure to timely file written objections to the Report and Recommendation as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals.** Snyder v. Ridenour, 889 F.2d 1363 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

The Clerk of Court is **DIRECTED** to transmit copies of this Report and Recommendation to counsel of record as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

Respectfully submitted November 17, 2023.

MICHAEL JOHN ALOI
UNITED STATES MAGISTRATE JUDGE